Case number 21-3424. Lisa Britt v. Hamilton County OH at all. All arguments not to exceed 15 minutes per side. Ms. Mary Carolyn Hyatt for the appellant. Good morning. Good morning, Your Honors. May it please the court, I'm Carolyn Hyatt and along with Al Gerhardstein and Jacqueline Green, we represent the plaintiff in this case, Lisa Britt, who is here with us today along with Tommy's father. I would like to reserve three minutes for rebuttal. This case concerns the tragic but avoidable death of Lisa's son, Tommy, who died at the age of 23 as a result of an infection that manifested while he was incarcerated at the Hamilton County Justice Center and for which he was denied medical care. When the district court granted summary judgment, this court had not yet applied Kingsley to the medical claims of pretrial detainees. In light of that decision, the issues in this case have become considerably simpler. The individual defendants, the three nurses and defendant Kildea, corrections officer, all knew that Tommy Britt had collapsed and experienced some change in consciousness, that he was completely unresponsive until roused with pneumonia, that he reported chest pain and that he needed to go to the hospital and that he was completely unable to stand or walk under his own power. He actually had to be carried out. But what do we make of the fact that after that incident, he seems to stabilize again? His condition does appear to have changed over time. It improved and then... Is it a total of seven days roughly? And what you're talking about is day four or five? The first few days that he was there, he was going through withdrawal and the infection had not yet manifested. The infection manifested on the 30th when defendant nurse McFarland was taking his vitals as part of the detox protocol and his pulse and temperature were elevated, which is a sign of infection. But then on the 31st, that's really the key point. At that time, some corrections officers saw Tommy collapse and they called a medical emergency. The nurses and defendant Kildea all respond. He's on the ground. You can keep going through the facts, but we do know the facts. I'm trying to ask you what the facts mean as opposed to what the facts are. The point I was getting at, what do we make of the reality that when he has this incident, it sounds like roughly day four or five, he does seem to stabilize? That's what I'm getting at. Is your point, well, so what? The minute you have a sign of an infection, you've got to go to the hospital. Is that the way you would answer the question I'm asking? I would not. His. It was not only the vital signs that were a sign of infection that are here, like the symptoms that he demonstrated on the night of the 31st that all of the defendants saw were bizarre, serious symptoms of something truly wrong with them. The vitals only supported that this really was a physical condition that he was experiencing and not merely faking, which is what the defendants decided. Because they decided that he was faking instead of taking these symptoms that on their face clearly demonstrated an obvious risk to Tommy and declined to investigate that risk. A jury could find both that they were objectively unreasonable in doing that and that they were deliberately indifferent. The district court erred even on that standard because it ignored Sixth Circuit precedent that said for both corrections officers and nurses that if they. Perceive these symptoms and attribute them to faking without investigating that inference of risk that that. So tell me the thing you're focused on now. Are you focused on the point that. The faking led to being put in the restraint chair and that's problematic because it has a punitive component to it. Is that the thing you're focusing on right now is a strong point or am I. I'm just trying to understand where you're coming from because I have some questions about that, but I don't want to take you there if that's not what you're focused on. That's not my focus right now. The focus is that because they decided he was faking, they denied him all access to medical care. Well, OK, so you are if you're going to keep saying faking. OK, so let's just talk through this point. You have this sense that, oh, maybe he's trying to get to go to the hospital. Maybe there's some manipulation going on. And you could say in retrospect, it doesn't look like it. But I guess the question I would say, since the claim is deliberate indifference, you know, putting him in the restraint chair. You know, from the outset, there was the suicide risk. That was from his reporting from the outset. And why isn't the restraint chair in some ways helpful? Because that means you're monitored more carefully. And didn't they talk to the doctor soon after? And I assume that's consistent with putting someone in a restraint chair. So the way I'm going with it is those all seem to lead to things that made the treatment less deliberately indifferent. In other words, there was more engagement with the patient. No, I have three points. So first, following Bronner, the standard that needs to be applied is whether they are objectively unreasonable. I was just making the point that under either standard that the district court had aired, even if it was deliberate indifference. We got the standard. But as to the fact. I mean, even with Bronner, it's still deliberate indifference. It's just another way of saying what the state of mind is to satisfy deliberate indifference, right? The court did describe it as a deliberate indifference standard. I think that's a confusing way to approach it because the standard is not a deliberate standard. It can be proven objectively. Well, indifference. The most important thing is just how that standard is defined. Subjective unreasonableness. OK. But as to the fact. So you asked me about the call to the doctor and the monitoring. OK. So as to the monitoring, the defendants admit that the purpose of putting him in the restraint chair was not to treat or monitor his physical condition. It was either. I just want you to try to answer the question I'm asking. The point I'm getting at is you can do something with a bad state of mind that could actually be helpful for someone. And that's what I'm trying to ask. Like, in other words, why are we worried about. You just focused on objective reasonableness. I couldn't agree more. That's where we should put the focus. So I find the state of mind point a bit of a sideshow because if it actually led to more intense treatment, that's hardly evidence of deliberate indifference. Well, I would say that it's strongly disputed whether that was treatment. While he was in the restraint chair, he was monitored for his behavior. His physical condition was not monitored at all. They did not take his vital signs. Once he was put in the restraint chair, his vital signs were not taken. He'd just been unconscious. He'd just been unconscious. Isn't it a good idea to make sure he's not unconscious? He'd just been found unconscious, right? Wasn't this where the ammonia had to wake him up? Yes. So why isn't monitoring good, even if vitals aren't being taken, to make sure they're not unconscious again? It wasn't treatment. I mean, that level of severity of a condition, that doesn't do anything to ameliorate his condition or determine if there's a problem. He regained conscious in their presence. They knew he was conscious. The question is what they needed to do after that. Putting him in the restraint chair did nothing to determine if he was deteriorating again. It did nothing to ameliorate his condition. And the call to the doctor was specifically made for the purpose of getting the approval to put him in the restraint chair. They called Dr. Johanson. He was the jail psychiatrist. He has to approve every time someone is put in the restraint chair. But isn't that good, given that you no longer have a claim against the doctor? No, because they weren't calling him to determine if they needed to do something for Tommy, if he needed to go to the hospital. They called him for the approval, which they should do if they're going to put him in the restraint chair, but that wasn't treatment. And they told him what they needed to to get that approval. They didn't tell him that he'd collapsed, that he'd lost consciousness, that he had chest pain, or that he was unable to walk. He didn't know any of those facts. He couldn't provide any assessment of medical opinion for them, and they didn't ask him for that. But he blessed the restraint chair. But he blessed the use of the restraint chair. Yes. So I'm trying to figure out if the restraint chair really, how much of a difference does that make in this case? I mean, you don't have a claim against the doctor. We just agree, blessed use of the restraint chair. So I'm trying to figure out is the restraint chair, how material is the restraint chair to this claim? Maybe that's the best way to put the point. Yeah, I guess I would say that I don't actually think that's the focus here. The focus is that they didn't give him medical treatment. That wasn't medical treatment for the condition that he had manifested. It wasn't meant to be medical treatment. After the defendant nurses assessed him, they came out to the hall and spoke with Defendant Kilday, and they said, he's faking, he doesn't need any more medical treatment. They weren't doing this to give him medical treatment. They were doing it to punish him. That's not the definitive determination of whether it was objectively unreasonable, but it's clear that they did not think that that was medical treatment. And, in fact, it did nothing to ameliorate his condition. It didn't monitor his physical condition. And he inevitably deteriorated again until it was too late by that point. Ms. Hyatt, we've had a number of these cases, unfortunately, lately, where somebody's been going through withdrawal when they're in some sort of detention. And it seems like in a lot of these cases, the best argument being made by the plaintiff in those cases is that the person might have been doing okay for a while, and then they deteriorated, and that it was obvious they were deteriorating, and nobody did anything about it. So if I'm sort of generally summarizing how those cases seem to develop, if we try to apply that here, he seemed to be going through what I think we could call normal drug withdrawal for the first three or four days. Is that right? Yes. So he has this incident on October 31st where he's found unresponsive on the floor of the cell. So once they brought him back breathing or conscious, a better way to put it, I guess, just ignore the restraint chair for a second. Is there anything in the record that suggests that his condition deteriorated from that point to the point where ultimately they summoned help two days later? Is there anything that shows that it deteriorated aside from the fact that he was found on the floor of the cell on the 31st? Anything to support the need to deteriorate between the 31st and the 2nd? Yes. From the time they used the ammonia to awaken him to the time when they summoned help, I think it was the 2nd. Not in the sense of any medical records because they weren't monitoring him and didn't provide him with any treatment, but he went from... Wait. They were taking vital signs. Dangerously. What? They were taking vital signs during those two days, no? No, they were not. He received no medical treatment after he was put in the restraint chair. But the restraint chair is for three hours. Yes. And then he got out and they did not take his vitals again after that until he collapsed for the second time. So no pulse, no temperature, nothing. So during that period, I think that's the right period to focus in on, what does the record tell us he was exhibiting? I don't think there's a record because no one was paying attention. They didn't put him on sick call. What does the record tell us one way or the other? Or what do you contend was happening during that period? Because I think what we're focusing in on was the question of whether the jail officials were reckless in not calling for help based on their observations with or without vitals. I'm sorry, can you repeat the question? Let me say it a different way. My understanding is once they awaken him and he's put in the restraint chair and then taken back out of the restraint chair, that the records show that he was cooperative and engaged and oriented as to time and place. Do you dispute that? I do not dispute that while he was in the restraint chair that he appeared to be oriented. I'm talking about after he gets out of the restraint chair, until the time that he collapsed and was taken to the hospital. What does the record show to be his condition? There's no record. Okay, so what do you contend was his condition? Inevitably and based on his condition two days later, we know that he continued to deteriorate. I don't know if he was responsive or oriented, but his physical condition quickly deteriorated after that. Let's assume that he was deteriorating, but it was not obvious. He didn't exhibit any signs of that deterioration. I want you to just assume that for a second. So what was the deliberate indifference from the time he got out of the When they became aware of this serious medical need and did nothing and prevented him from obtaining medical treatment without ensuring that whether or not these symptoms were fake, that was deliberately indifferent and objectively unreasonable. So it isn't that they were ignoring something during the last couple of days that he was in the jail. Your whole case then centers on what they failed to do after they found him collapsed on October 31st. Yes. After he got out of the restraint chair, none of these individual defendants were involved in his care. It was that night. And the fact that he happened to become more coherent after that doesn't absolve them of their obligations. They didn't wait to find out. They decided he was faking, and they refused to offer him medical treatment after that. And based on the severity of his symptoms, that was objectively unreasonable and deliberately indifferent. Did he ask for medical treatment? Yes. He asked to go to the hospital and became very upset when they refused. Right, right. But after that... I'm sorry. Go ahead. I guess it wasn't one of the problems here that they removed him from the detox protocol, which means as a result of being removed from that, they ceased faking his vitals. But that was sort of an affirmative act that was done by him that contributed to the bad outcome that occurred here. Yes, I would agree with that. The district court erred in finding that his symptoms were consistent withdrawal, but that's disputed by the fact that they actually took him off the detox protocol on the 31st. And as you point out, as a result of that, he actually received less medical treatment after that point because they stopped monitoring his vital signs, which would have caught his continued deterioration after this point. I do see my time is up. All right. You'll get your full rebuttal. We'll hear from the other side. Good morning. May it please the Court, Robert Hynoski for the defendants, NAFCAR, Inc., its nurses, Nurse McFarland, Kolb, and Moore, and also Sergeant Melissa Kilday of the Hamilton County Sheriff's Office. Regardless of the standard that is applied to the deliberate indifference claim, the district court properly granted summary judgment to all the defendants in this case. There is no evidence from which any jury could conclude there's anything beyond nursing negligence in this case I just want to make sure I'm understanding one part of the case. Sure. So he's unresponsive on the 31st. That leads to waking him up. They put him in the restraint chair. They're monitoring him. They talk to the doctor. That roughly ends, what, the afternoon of the 31st? The evening of the 31st. So I think the macro timeline, as you indicated, is what we're looking at. Good for you. You've got a place you want to go, but why don't you wait for me. All right. So the evening of the 31st, he's now out of the restraint chair. They've talked to the doctor, I guess after the fact, but it was okay that they put him in the restraint chair. From the evening of the 31st to the morning of November 2nd, when he's found at 5 a.m. or so and not doing well, they definitely are monitoring him. He's on suicide watch, so they're monitoring him in terms of he's awake and alert, so he hasn't collapsed again, but they're not taking any vital signs? Why is that? Well, the standard protocol is that inmates that are detoxing from, in this case, heroin or similar drugs, are put on detox checks for a series of days. I think it's roughly, on average, five or six days as a standing order. And so that order comes off as a matter of course. That said, we are talking about less than a 36-hour micro timeline, I would suggest, from the time he collapses. Okay, well, let's just try to have a conversation here. Sure. So first answer is it had been five days, that's the normal time for taking the vitals in terms of detoxing, and their theory was he was done with the detoxing. But why wouldn't going unconscious or not being responsive not make you think, well, maybe we need to do this a little longer? It was reported that he was unconscious, and there was a code called, and there was a sergeant that shows up along with the three defendant nurses that were named. They gave him an ammonia inhalant. He immediately responded. He got to his feet. The testimony is that he was combative. He tried to bite a nurse. He was aggressive. Sergeant Kilday testified that she'd seen this type of behavior with detoxing patients in the past. They would essentially do anything to try to get to a hospital, hurt themselves, et cetera. That's why she orders that he goes into restraint chair for his own safety, which he's only in for roughly two hours. Nurse Moore is with him. She does 15-minute checks during that time period. She testifies. He says he's doing better. He's cooperative. He calms down. He says he feels better. He then, after calling Dr. Johanson, the decision is made to put him on suicide watch. He has a history of suicide ideation attempts. The conversation with the doctor, does the doctor say, when he says put him on suicide watch, is he also saying no need to keep taking vitals? Does he say? That's not in the record. But it's important to explain what happens when he went on suicide watch, and this is in the record. When he goes on suicide watch, he's moved from his normal housing cell to the psychiatric unit, to the mental health unit. He's put into an observation cell. He's given different clothing for suicide precaution reasons. He's in a glassed area, which is, you know, observable. And from that point forward, from the time he goes on suicide watch until the morning of the second, less than 36-hour time period, he is seen every 10 minutes by a guard. The protocol in the jail is that when someone's on suicide watch, there's 10-minute checks done. Also, not mentioned, either in briefing or here today, the next day on the 1st, November 1st, he is seen by a NAF care nurse, and he's assessed, a mental health nurse. And her testimony is he looked good. He was cooperative. He wasn't complaining of any issues. He didn't ask for any medical care. In a lot of these cases that this court has addressed in the past where a fact question is found, there's evidence of multiple sick call requests. There's evidence of multiple requests for care that's denied or ignored, et cetera. There is no evidence of that in this case. There's no indication that during a med pass, during any of his vital checks, during any interaction with any guard or nurse prior to the morning of the second, that he asked for care, that he was denied care. He was never denied care. He did ask to go to the hospital. He did ask to go to the hospital. He was assessed. It was determined in the judgment of RN nurse Moore that he didn't present an emergent situation. His vitals were stable, according to her testimony. He was cooperative. He then felt better, did better. There's no evidence in the case, and the absence of this evidence is important, that over the next 36 hours there's any report from a guard that he's sick or not feeling well, that there's any indication that he's not able to eat his meals, that there's any other alteration of consciousness. He's again assessed on the first by a nurse who indicates that he's cooperative, his judgment is good, he's alert, he's oriented, the time and place. And then at roughly 5 in the morning on the second, so we go from the evening of the 31st, by the time he goes to the mental health unit, it's almost midnight, so we're not even looking at 36 hours here. The essence of the case is essentially a negligence claim that he should have gone to the hospital 24 to 36 hours sooner, even though there's no evidence in the case that would have changed his outcome whatsoever. When he goes to the hospital, it's indicated, ultimately, take some time, some tests, etc., that he has endocarditis, an infection caused presumably by using IV needles, heroin use. There was no indication before his sudden deterioration on the morning of the second that he had endocarditis. There certainly is no proof of subjective knowledge of any of these nurses that he had that. I think they would say endocarditis is an infection, and there was evidence that you could think there was an infection. Well, he hadn't been diagnosed with endocarditis, of course. His symptoms were entirely consistent with detox, with withdrawal symptoms. He had a slightly elevated temperature on a few occasions and a slightly elevated pulse rate, but they were not significant. He wasn't unstable. He responded to the ammonia inhale, which they used to determine if someone is actually unconscious or not. And as soon as that was done, he was cooperative. Well, he was combative initially, but he was alert, he was oriented, he wasn't confused. And the essence of endocarditis is that he had an infection that ultimately created vegetation on his heart valves, and ultimately that vegetation breaks off and causes stroke, and that's ultimately what occurred here. Counsel, one of the problems in his last days was that they had stopped taking his vital signs, which meant that they were not taking his temperature. And elevated temperatures are one of the prime indications of infection or endocarditis. If they had been taking his temperature, perhaps they would have identified that problem much earlier, don't you think? Well, his vitals were taken. The record would indicate, and again, in terms of the evidence being overwhelming, that he was not ignored at all. He was seen multiple times per day, from his admission to the jail, from his initial screening to his physical assessment to the next day. His then vitals are getting taken two to three times a day. He's getting medications as prescribed per normal detox protocol. They sometimes refer to as comfort medications for pain and nausea, et cetera. He's getting fluids. He's eating his meals. He is assessed every day multiple times a day. There's not evidence in this record that his vitals were taken on November 1st. There's not indication of that. But there is indication that he was on suicide watch, that he was seen with 10-minute checks, no reports of problems. He also was assessed by a nurse. Now, could one argue in a nursing negligence case, in a standard state law med mal case, that his vitals should have been taken on the 1st, and if so, what that may or may not have shown? Maybe from a pure negligence analysis. Well, you keep repeating all the things they were doing, and these things that they were doing, they were doing before they removed him from the detox protocol and stopped taking his vitals. You don't address that. You just repeat all the things they were doing before they stopped. And so I'm not seeing that you're really addressing what occurred leading to the death. I'll address that. Deliberate indifference, of course, has to be evaluated, as this Court has held many times, individually, based on the individual defendants in this case. So when we look, and we went through this at length in our merit brief, as to the actions, slash inactions, of the three nurses that are named, as well as Sergeant Kilday. Nurse McFarlane saw him and took his vitals, as per detox checks, I think the 29th, 30th, and she also responded to the code on the 31st. No further involvement. Nurse Kolb did nothing other than respond to this code, which was one of the three nurses that responded. She did nothing else. She wasn't involved. Nurse Moore responded to the code, assessed him, took his vitals, and then did 15-minute checks while he was in the chair and called the doctor. No further involvement. There's no indication that those three nurses continued to work, or that they were on duty, or that they did anything else that would suggest they were somehow reckless or deliberately indifferent to Mr. Britt over the next 36 hours. To the extent that... ...in order to get permission to put him in that restraint chair. The indication was that after Sergeant Kilday ordered him from a correctional standpoint into the restraint chair for his own safety, that per protocol, Dr. Johanson, the staff psychiatrist, was contacted. Because there has to be notification when that occurs. That's the Lease and AFCAIRS policy on that. And that when that occurred, he indicated, based on the information that was available, prior drug use, prior suicide history, report of depression when he came in. In fact, he was evaluated by a mental health nurse on his second day, and it was advised he perhaps get PRN counseling while he's there. That the decision is made for his own safety to put him on suicide watch. Can I ask a question about... Go ahead. Judge Clay, go ahead. Thank you, Chief Judge. Let me just ask you something about the case law here. While this case was in the district court, the Bonner case did not come down at that time. And the district court made the statement that if the Sixth Circuit had adopted the Kingsley rule, the case, meaning the case before us today, would have come out, should have come out the other way. And so now we do have a Browner. And what do you make of the district court statement that if the law had been, from the case before the district court, if the law had been as it is today, the case would have come out to the contrary in the district court. Do you take exception to the district court statement? I do. When the district court, when we briefed this, the summary judgment, frankly, when we briefed it to this court, Browner had not been decided. I think Browner may have just came out. Maybe when we were finishing our brief, the timing was close. And then I know the Green decision came out, Judge McKee, that you authored recently. When the district court analyzed whether or not Kingsley would be applicable to a pretrial detainee's rights, and that's another issue. I don't believe Mr. Britt was a pretrial detainee, and I'll, if permitted, address that briefly. Kingsley did not set forth a standard in terms of if the standard was changed. That was an excessive force case. Kingsley didn't articulate a new deliberate indifference standard, if you will. The Browner decision in a two-to-one decision, as this court knows, this panel knows, essentially created a standard or is attempting to create a standard of recklessness. Kingsley didn't say that. Kingsley didn't analyze it that way. So Browner was not available for Judge McFarland to review in analyzing this case. I would respectfully submit, strongly submit, that there is no evidence of reckless indifference in this case, if that is the new standard. I want to try to understand is what happens if there's no suicide watch? In other words, is there a policy at the jail, the health care provider, when someone's detoxing, is it five days? Is it seven? Is there an automatic time after which, because when someone's in pre-trial detention, they don't take your vitals all the time, right? So this was clearly something you did because someone's detoxing. Yes. When does that end? Is that a timeframe? Is it a we ask the doctor? I'm trying to figure out what happens if he hadn't been put on suicide watch. I'm not sure the record is completely flushed out in that regard. I can historically tell you, no, that generally speaking, inmates go on detox checks for roughly five days, if my memory serves me correctly. Those are done generally in the normal population. When someone goes to the mental health unit, it changes because they're then being seen every ten minutes by guards. There's mental health nurses there. A staff psychiatrist is there. Why specifically detox checks were stopped and or just not done on the first is not entirely clear, other than the fact that he was on suicide watch. But that's not in the record that someone has affirmatively made the specific decision that he's going off detox checks once he went on suicide watch. There's just an absence of a check being done that day. But as it relates to these three nurses that are named, there's no indication they were on duty, they did anything wrong. He was rounded on by a mental health nurse who's not named in this case. And I would submit just very briefly, as we outlined in our brief, that we don't believe Mr. Britt was a pretrial detainee. He had previously pled guilty of a third-degree felony for burglary. He was sentenced to three years of community control in lieu of three years of prison. And he was currently in jail on a second probation violation. And we've cited case law, even though it's scant, but we have cited case law that suggests that once someone is convicted of a crime, they do not qualify as a pretrial detainee. Therefore, we think the Eighth Amendment, deliberate and different standards, should apply. Mr. Hanusky, I want to go back just real briefly to these five defendants that I understand remain in the case, plus NAFCARE. So I think either you or Ms. Hyatt said... Or plus NAFCARE, I think. Farland, Kolb, Moore, Johansson, and Kilday. Dr. Johansson was a staff psychiatrist that they abandoned and said that they were not opposing summary judgment against Dr. Johansson at the trial court level. Okay, so Johansson's out. So we've got four individuals left. Three of them are nurses. And I just want to verify this. Did any of the nurses have any contact with this individual after the incident on the 31st? After he was taken out of the restraint chair and sent to the mental health unit and put on suicide watch. There's no indication that either of those three nurses had any further contact with him. So the question isn't what they observed or should have observed during that period, because they weren't involved. Correct. So their actions are measured against what they allegedly failed to do when they found him unresponsive in the cell. I agree. And I think the only essence of that argument... So who's the fourth one then? Sergeant Kilday, a corrections sergeant who responded to the code. So did Kilday have any involvement before the code at the end? No. And what is he alleged to have done when he did respond? She. Melissa Kilday is alleged to have wrongfully ordered Mr. Britt into a restraint chair. Testimony is once that was done. I thought you said that happened on the 2nd. So she had involvement, as did the three nurses, on the 31st. Correct. Then did she have any involvement after that? She did not. When he went to the restraint chair, he was moved to a different unit. All right. Got it. That's all I wanted to know. Thank you. Any further questions? Thank you. I'd ask that the district court be affirmed. Thank you. We'll hear rebuttal. So Ms. Hyatt, the reason that I was asking those questions is to just go back to where you and I were in our conversation before. There isn't anything that we need to address ourselves with in terms of these four individuals as to what they did or didn't do after the incident on the 31st, because they weren't involved with him afterwards, right? That's accurate. The issue here is the 31st when he manifested an obvious serious medical need, and they denied him medical treatment for that condition. And his symptoms, the district court and opposing counsel are failing to take the facts in a light most favorable to the plaintiff. These are factual disputes that need to go to a jury. He lost consciousness, couldn't walk, and was experiencing chest pain. These aren't minor symptoms. These aren't the normal expected symptoms of withdrawal. These are serious symptoms that needed to be seen by a doctor or a hospital. So just out of curiosity, I should know this. I'm sorry I don't. What does the record show? Is there an expert in this case that said had he been sent to the hospital on that date, the outcome would have been different? Yeah. Dr. Mendel opined that there was a substantial chance that he would have recovered if he had received treatment sooner. In other words, the infection could have been addressed more readily before it progressed for the additional 36 hours. Yeah. Well, he had clearly substantially deteriorated over what he was before. It would have made a difference if it had been that day instead of two days later when he deteriorated even further. In your opening, you made it seem problematic that vital signs weren't taken after he goes to the psych unit. And I guess I'm curious why you didn't bring the people in the psych unit into the case and say you should have taken his vitals during those 36 hours. They didn't have knowledge of what the defendants that remain in this case did. They didn't have any reason to know that he'd collapsed, lost consciousness, had chest pain, that he couldn't walk. They didn't have those facts. It seems to me in every case that we have, there are jail records that the people coming on duty look to see what had happened to the people in their care the day before. That's not true in this case? There's nothing in the record to support that. But why wouldn't the doctor have said, I mean, why isn't your claim against the doctor then? For the doctor not saying, just finish the question. The doctor saying, making it binary, you know, suicide watch as opposed to monitoring with detox. Why wasn't your claim against the doctor, if you want to put him on suicide watch, that's fine, but you've got to keep taking the vitals. He's still detoxing. Defendant Moore only told Dr. Johansson what she needed to get him to agree to the restraint chair. He didn't know the severe symptoms that Tommy was exhibiting. The people who are liable for this are the ones that knew that he had an obvious serious medical need and who recklessly disregarded that risk. Additionally, to get back to the issue of the district court, when the district court found that if Kingsley was followed that it would make a difference and that those defendant nurses should all have been denied summary judgment, this issue was very thoroughly briefed to the district court and the standard argued at that point was the same one that Bronner did end up adopting. That was the second restatement of tort's definition of recklessness discussed in Farmer v. Brennan. That's what Bronner adopted and that's what we argued and what the district court was basing that determination on. So this really, in regards to the defendant nurses, should be remanded for the district court to do exactly what it said it would do. Usually on appeal, the appellant isn't as trusting of trial judges. I guess this is a minor exception. Even with the district court failing to take all of the facts in the light most favorable to plaintiff, it's still thought they were objectively unreasonable and should be denied summary judgment and defendant Kilday should for the same reason. She even admits that he needed to see a doctor. There really aren't questions here. It was serious and they needed to do something and they completely cut him off from any possibility of medical treatment. I do see my time is up. So unless you have any questions. I don't think so. Judge Clay, any more questions? No sir. Alright, thanks to both of you for your helpful briefs and oral argument. We appreciate them as always. Case will be submitted and the clerk may adjourn court.